UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DOW JONES & COMPANY, INC. | § | No. 1:22-cv-00564-DAE |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| THOMAS BRITTON HARRIS IV, | § | |
| *Defendant.* | § | |

<u>ORDER ON SUMMARY JUDGMENT</u>

Before the Court are cross motions for summary judgment filed by

Plaintiff Dow Jones & Company, Inc. ("Plaintiff" or "Dow Jones") (Dkt. # 45) and

Defendant Thomas Britton Harris IV ("Defendant" or "Harris") on March 8, 2024.

(Dkt. # 46.)  Both parties filed responses on March 22, 2024.  (Dkts. ## 47, 50.)

Both parties replied on April 5, 2024.  (Dkts. ## 57, 58.)

The Court finds this matter suitable for disposition without a hearing.

After careful consideration of the filings and relevant case law, the Court, for the

following reasons, **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Partial

Motion for Summary Judgement and **GRANTS IN PART** and **DENIES IN PART**

Defendant's Motion for Summary Judgment.

<u>BACKGROUND</u>

Dow Jones is a global provider of news and business information.

(Dkt. # 45 at 1.)  Two of its publications include *The Wall Street Journal* ("WSJ")

and *Barron's*, which are published in both print and digital formats.  (Id.)  Dow Jones allows its subscribers to print or download articles for personal use located on the *WSJ* and *Barron's* digital site.  (Dkt. # 1 at 6.)  However, Dow Jones requires its subscribers and non-subscribers to pay a fee for a license to distribute a reprint of any *WSJ* or *Barron's* article to more than a few individuals, regardless of whether the licensee or recipients of the reprints are subscribers or whether the emails distributing the reprints are opened.  (Id. at 5.)

Defendant Britton Harris is an investment manager and professor. (Dkt. # 1 at 2.)  From December 2006 to June 2017, Harris was the Chief Investment Officer ("CIO") at the Teacher Retirement System of Texas ("TRS"), managing the state's pension plan for public teachers.  (Dkt. # 46 at 2.)  From July 2017 to June 2023, Harris was the Chief Executive Officer ("CEO") and CIO of the University of Texas Investment Management Company ("UTIMCO"), which manages the investments of the University of Texas and Texas A&M University systems.  (Id.)  In 2023, Harris retired from UTIMCO and currently serves as CEO and CIO of the Texas Permanent School Fund through his personal investment restoration service called On Eagles Wings.  (Id.)

In 2006, Harris began teaching as a professor at Texas A&M University.  (Dkt. # 46 at 3.)  He developed a course titled Titans of Investing ("Titans"), which aimed to prepare students to be involved in the elite world of

business.  (Id. at 2.)  In 2016 and 2018, Harris expanded this course to Baylor University and the University of Texas, respectively.  (Id.)  Harris has taught over 900 students in the Titans course over the years.  (Id.)  In 2012, Harris also expanded the Titans course outside of the university environment to members of his Austin-based church.  (Id. at 3.)

As part of his Titans curriculum, Harris believes it is important for his Titans students to read current events.  (Id. at 4.)  Harris started a "Reading With Britt" email program ("RWB Emails").  (Id.)  The RWB Emails entailed a list of daily articles for his students to read.  The topics varied from day to day based upon a schedule Harris developed himself.  The schedule includes the following: on Mondays, a review of the previous week; on Tuesdays a focus on America; on Wednesdays, a focus on Japan and Europe; on Thursday, emerging markets and alternative investments, and on Friday, life and general interest.  (Id.; Dkt. # 1 at 9.)  An example of a daily RWB Email can be seen below:

| From: | Toalson, Sharon |
|---|---|
| Sent: | Friday, August 25, 2017 3:03 PM CDT |
| To: | GRP-UTIMCO |
| Subject: | RWB 8.25.17: Life Issues and Subjects of General Interest |
| Attachments: | 8.25.17.pdf |

| WSJ | What Would Ben Franklin Say? |
|---|---|
| | The Disturbing Inevitability of Cyberattacks |
| | The Assault on Free Speech |
| | The Next Step After a Bad First Impression at Work |
| Barron's | The Happiness Conundrum |
| Bloomberg | Dalio's Quest to Outlive Himself |
| Evercore ISI | Flash Note - Kelly Ousts Bannon, Market Positive |

(Dkt. # 45, Ex. G.)

To circulate the RWB Emails, Harris enlisted the help of his personal Executive Assistant, Sharon Toalson.  (Dkt. # 46, Ex. 2.)  The process to prepare the daily RWB Emails included the following: (1) Harris identifying articles he intended to include in the daily RWB Email; (2) sending an email with links to the articles to his assistant(s); (3) the assistant saving each article as a PDF through the print icon on the websites; (4) creating a "single electronic file" that consisted of a saved version of the online articles in the order listed in the email table; (5) creating a table listing each of the included articles and their respective publications; (6) adding in the hyperlink to the articles in the table to include in the RWB Email; and finally (7) forwarding the complete RWB Email to the distribution list.  (Id.; Dkt. # 45, Ex. F.)

The RWB Emails were initially only sent to Titans students.  But once those students graduated or moved on from Harris' Titans course, those individuals stayed on the RWB Email distribution list.  (Dkt. # 46 at 4.)  While Harris was serving as the CEO at the TRS, he began to include TRS employees in the same RWB Email distribution list as his former and current Titans students.  (Dkt. # 45 at 11.)  When Harris started working at UTIMCO, he included UTIMCO employees in his RWB Emails list.  (Id.)  To date, the RWB Email distribution list contains 1,000 individuals, ranging from former Titans students to TRS and UTIMCO employees.  (Id. at 4.)

On May 25, 2020, Dow Jones received an unsolicited email from Edward Bradley informing it of Harris' RWB Emails and potential copyright infringement.  (Dkts. ## 1 at 13; 45 at 9–10.)  Upon receiving this notice, Dow Jones contacted Harris and informed him of his alleged infringing activities.  Id.  Harris thereafter stopped circulating RWB Emails with attached PDFs of the articles, and instead started circulating his emails with links directly to the articles.  (Dkt. # 46 at 5.)

On June 10, 2022, Dow Jones filed the instant lawsuit against Harris alleging copyright infringement, violation of the Digital Millenium Copyright Act ("DMCA"), and breach of contract.  (Dkt. # 1 at 14–18.)  Specifically, Dow Jones alleges, "[f]rom October 2010 to July 2020, Harris directed the wholesale copying

and distribution of at least 6,186 Dow Jones Copyrighted Works verbatim from WSJ.com and Barrons.com [ ] to between 1,000 and 1,200 business professionals as PDF attachments to the RWB [Emails]."  (Dkt. # 45 at 4.)  Both parties have moved for summary judgment on these claims.  (Dkts. ## 45, 46.)

<u>LEGAL STANDARD</u>

"Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Griggs v. Brewer</u>, 841 F.3d 308, 311–12 (5th Cir. 2016); see also Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Johnson v. World All. Fin. Corp.</u>, 830 F.3d 192, 195 (5th Cir. 2016) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  <u>E.E.O.C. v. LHC Grp., Inc.</u>, 773 F.3d 688, 694 (5th Cir. 2014) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). While the movant must demonstrate the absence of a genuine dispute of material fact, it does not need to negate the elements of the nonmovant's case.  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994).  A fact is material if it

"might affect the outcome of the suit."  Thomas v. Tregre, 913 F.3d 458, 462 (5th

Cir. 2019) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

DISCUSSION

Plaintiff moves for judgment as a matter of law on its copyright

infringement and breach of contract claims.  (Dkt. # 45 at 6.)  Defendant moves for

summary judgment on the copyright infringement, DMCA, and breach of contract

claims.  (Dkt. # 46 at 1.)

I.    Copyright Infringement

Section 106 of the Copyright Act confers a bundle of exclusive rights

to the owner of a copyright, including the right "to publish, copy, and distribute the

author's work."  Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539,

547 (1985).  But these rights are subject to "certain statutory exceptions,"

including the "privilege of other authors to make 'fair use' of an earlier author's

work."  Id. (citing 17 U.S.C. § 107).

A.    Infringement

Dow Jones argues it is entitled to judgment as a matter of law on its

copyright infringement claim because there is no dispute of material fact that it

owns valid copyright registrations for at least 5,371 copyrighted works registered

with the U.S. Copyright Office.  (Dkt. # 45 at 6.)  Further, direct evidence shows

that Harris created identical, or nearly identical, copies of the Dow Jones

copyrighted works and distributed them without permission from Dow Jones.  (Id.)

        "A copyright infringement action requires the plaintiff to prove

ownership of a valid copyright and copying by the defendant."  Norma Ribbon &

Trimming, Inc. v. Little, 51 F.3d 45, 47 (5th Cir. 1995).  Ownership is established

by proving the originality and copyrightability of the material and compliance with

statutory formalities.  Allied Mktg. Grp., Inc. v. CDL Mktg., Inc., 878 F.2d 806,

811 (5th Cir. 1989).  Copying is generally established by proving that the alleged

infringer had access to the copyrighted materials and that the copyrighted material

and allegedly infringing material are substantially similar.  Norma Ribbon, 51 F.3d

at 47.

        It is undisputed that Dow Jones has valid copyrights for 91 group

registrations of sets of magazine and newspaper issues, 21 certificates for group

registrations of database updates, and 36 certificates for registrations of single

issues.  (Dkt. # 21 at 10.)  Certain *WSJ* and *Barron's* articles fall within these

copyright certificates and are entitled to copyright protection.  It is also undisputed

that Harris had access to the copyrighted materials through his digital subscriptions

to *WSJ* and *Barron's*, and such subscriptions have continued to be renewed since

2010.  (Dkt. # 45, Ex. P; Ex. B at 2.)

The Court finds the evidence shows Harris made identical, or nearly identical, copies of Dow Jones's copyrighted works in his RWB Emails by downloading and attaching PDFs of protected articles.  The evidence is also undisputed that Harris circulated identical copies or portions of Dow Jones's copyrighted works to hundreds of recipients in the RWB Email list over many years without paying the requisite licensing fee.  (Dkt. # 46, Ex. 1 at 2.)  Harris does not dispute this conduct.  Therefore, Dow Jones established as a matter of law that Defendant engaged in copyright infringement.

However, the inquiry does not end there.  Harris argues Dow Jones's copyright infringement claims still fail as a matter of law because his alleged "unpaid, noncommercial, educational distribution" of his RWB Emails was a fair use.  (Dkt. # 46 at 7.)

B.    Fair Use

"Any individual may reproduce a copyrighted work for a 'fair use.'" Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 433 (1984). Section 107 of the Copyright Act codified this exception and states that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  Fair use is an affirmative defense that "can excuse what would otherwise be an infringing use of

9

copyrighted material." Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1238 (11th Cir. 2014); Estate of Barré v. Carter, 272 F. Supp. 3d 906, 929 (E.D. La. 2017). In determining whether the use of a work is fair use, courts consider:

> (1) [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The four factors are nonexclusive and are weighed together. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994); Harper & Row, 471 U.S. at 560. Fair use is a mixed question of law and fact that requires a case-by-case determination as to whether a particular use of a copyrighted work is a fair use. Campbell, 510 U.S. at 577; Harper & Row, 471 U.S. at 560. "[I]t may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion—but not otherwise." Peteski Prods., Inc. v. Rothman, 264 F. Supp. 3d 731, 734 (E.D. Tex. 2017) (quoting Ty, Inc. v. Publ'ns Int'l Ltd., 292 F.3d 512, 516–17 (7th Cir. 2002)). "[W]here the district court has [f]acts sufficient to evaluate each of the statutory factors, it may conclude as a matter of law that the challenged use is not a protected fair use." Id. (quoting Castle Rock Entm't v. Carol Publ'g.

Grp., Inc., 955 F. Supp. 260, 267 (S.D.N.Y. 1997), aff'd, 150 F.3d 132 (2d Cir. 1998)).

           i.      Purpose and Character of the Use

For the first factor, courts often consider "the culpability of a defendant's conduct in acquiring or using a work, the extent to which such use is transformative, and whether such use is for commercial or non-commercial purposes." Peteski Prods., 264 F. Supp. 3d at 736. The focus of this factor is "whether and to what extent the new work is 'transformative.'" Campbell, 510 U.S. at 579. In determining whether a use is transformative, courts evaluate "whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Peteski Prods., 264 F. Supp. 3d at 739 (quoting Campbell, 510 U.S. at 579).

It is uncontested that Harris downloaded Dow Jones articles verbatim and sent those articles to the RWB Email list. But Harris claims those RWB Emails were circulated for nonprofit educational purposes. (Dkt. # 46 at 8.) The Court agrees that the origination and use of the RWB Emails specifically for the Titans course falls under an educational purpose. Indeed, Dow Jones explains, "[t]his lawsuit does not involve Harris' conduct as a professor or the distribution of RWB Newsletters to then-enrolled university students. (Dkt # 45 at 12, n. 17.)

Thus, the RWB Emails sent to current Titans students at the time they were in the course likely falls under fair use.

However, the issue is that Harris decided to send those same RWB Emails containing copyrighted works to hundreds of TRS and UTIMCO employees over the years, who had no connection to the Titans course.  (Dkt. # 45 at 10–11.)  In fact, Harris concedes he sent the RWB Emails to "a smattering of other people [who] just asked for it."  (Dkt. # 45, Ex. A. at 42.)

The Court agrees that Harris circulated the RWB Emails for nonprofit purposes.  (Dkt. # 46 at 9.)  The evidence is undisputed that Harris did not charge recipients to receive the RWB Emails or receive revenue at any time.  (Dkts. ## 1, Ex. 1 at 2; 47 at 14.)  Harris maintains "he was teaching business students and fostering nonfiction habits for people engaged in the real world."  (Dkt. # 50 at 11.)  This purpose was not refuted by the evidence and was corroborated by Harris' evidence that he urged RWB Email recipients to subscribe to the publications at issue.  (See Dkt. # 46, Ex. 2-3 at 2.)  Therefore, the Court finds the purpose behind the RWB Emails containing PDF copies of Plaintiff's copyrighted works was for nonprofit educational purposes.  However, the Supreme Court has held that "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement."  Campbell, 510 U.S. at 584; see also Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 450 (1984) ("Even copying for

noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have.").

As for the transformative nature, Harris claims his RWB Emails containing the PDF articles were transformative because they "conveyed his unique conception of what news of the week was worthy of his audience's study." (Dkt. # 46 at 10.)  Dow Jones argues that simply gathering copyrighted works into a new document is not a transformative use, even when that compilation seeks to convey a message, such as which works are best.  (Dkt. # 47 at 13.)

The Court agrees with Dow Jones.  The general purpose of the RWB Emails was to share news articles worthy of study and to inform recipients apprised of what is going on in the world.  (Dkts. ## 46 at 10; 47, Ex. B at 3.)  In other words, Harris decided to distribute *WSJ* and *Barron's* articles, among others, to his RWB Email distribution list to share information on current events he thought were important.  This does not add anything new to the nature of the articles.  Dow Jones's purpose in publishing its articles is also to inform the public about newsworthy events across the world that it deems important.  (Dkt. # 47, Ex. A at 4.)  Therefore, this factor weighs against fair use.

    ii.   <u>Nature of the Copyrighted Work</u>

When courts evaluate the second factor, they consider two distinct inquiries.  First, "highly creative or fictional works are generally afforded

'maximal protection, and hence it is less likely that use of such works will be fair use.'" Peteski Prods., 264 F. Supp. 3d at 740 (quoting Patton, 769 F.3d at 1268). "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." Harper & Row, 471 U.S. at 563

Harris claims in sending the articles, he was sharing the "ideas and facts contained in his reading list, neither of which are protected under copyright law." (Dkt. # 46 at 11–12.)

The Court finds that Harris did more than merely share the "ideas and facts" contained in the articles reading list. He copied and forwarded the articles to colleagues without paying the requisite licensing fee for non-personal use. If Harris only intended to share the underlying facts and ideas within the articles, it likely would have been that Harris shared summaries of the underlying facts contained therein, rather than a compilation of verbatim copies of the articles.

Even though news articles are factual in nature,[1] courts have concluded wholesale copying and redistribution of news reports is not a fair use. See, e.g., Fox News Network, LLC v. TVEyes, Inc., 883 F.3d 169, 178 (2d Cir. 2018) (citing Authors Guild v. Google, Inc., 804 F.3d 202, 220 (2d Cir. 2015))

---

[1] The Court agrees with Plaintiff's assertion that news articles are copyrightable. In Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991), the Supreme Court explained the notion that there may be copyright protection for an article; however, that protection is not extended to the underlying factual information an article may contain. Id. at 353–54.

("Those who report the news undoubtedly create factual works.  It cannot seriously be argued that, for that reason, others may freely copy and re-disseminate news reports.")  Therefore, this factor weighs against fair use.

              iii.    <u>Amount and Substantiality of the Portions Used</u>

In considering the amount and substantiality of the portions used, courts "examine both the quantitative and qualitative aspects of the portion of the copyrighted material taken."  <u>Monge v. Maya Magazines, Inc.</u>, 688 F.3d 1164, 1178 (9th Cir. 2012) (citing <u>Campbell</u>, 510 U.S. at 586).  "While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use."  <u>Kelly v. Arriba Soft Corp.</u>, 336 F.3d 811, 820 (9th Cir. 2003).  That said, "the extent of permissible copying varies with the purpose and character of the use."  <u>Bill Graham Archives v. Dorling Kindersley Ltd.</u>, 448 F.3d 605, 613 (2d Cir. 2006) (citing <u>Campbell</u>, 510 U.S. at 586–87).

Here, Harris copied the articles verbatim.  This is evident through his instructions to his assistants to print the articles directly from *WSJ* and *Barron's* and attach them to the daily emails.  (Dkt. # 46, Ex. 2-1, 2-2.)  No changes were made to the articles other than the process of compiling them together into a PDF to be included in the RWB Emails.  Both qualitatively and quantitatively, Harris unreasonably reproduced the articles.  Accordingly, this factor weighs against fair use.

iv.   The Effect on the Works' Potential Market or Value

Finally, courts consider "the effect of the use upon the potential market for or value of the copyrighted work." Campbell, 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). "This last factor is undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566. Analysis of this factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer," but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." Campbell, 510 U.S. at 590 (cleaned up). Put differently, the inquiry "must take account not only of harm to the original but also of harm to the market for derivative works." Harper & Row, 471 U.S. at 567.

This factor presumptively weighs in the plaintiff's favor if the use is commercial, because "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." Balsley, 691 F.3d at 760 (quoting Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 451 (1984)). However, when the "second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred." Campbell, 510 U.S. at 591. Courts have described this factor as "concerned with secondary uses that, by offering a

16

substitute for the original, usurp a market that properly belongs to the copyright

holder." Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 24 (1st Cir.

2000) (quoting Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 110 (2d Cir.

1998)).

   Harris claims he made no commercial advantage from disseminating

the articles in his daily emails.  The evidence demonstrates he did not directly

monetarily profit from his RWB emails.  However, that is not the sole question.

The Court must also look to the impact of the market for Dow Jones's copyrighted

works.  See L.A. Times v. Free Republic, No. CV 98-7840 MMM(AJWX), 2000

WL 565200, at *21 (C.D. Cal. Apr. 4, 2000); Emmerich Newspapers, Inc. v.

Particle Media, Inc., No. 3:21-CV-32-KHJ-MTP, 2022 WL 3222892, at *5 (S.D.

Miss. Aug. 9, 2022) ("Verbatim copying of articles has potential to interfere with

Emmerich's market for online article viewership.").

   Even if inadvertent or in good faith, Harris' circulations of wholesale

copies of articles obviated any need for recipients to visit the *WSJ* or *Barron's* sites

to seek the original work.  Over the years, Harris circulated copies of over 6,186

Dow Jones articles, for which Dow Jones claims at least 5,371 were entitled to

copyright protection through valid United States copyright group registrations.

(Dkt. # 45 at 17.)  Thus, the RWB Emails attaching the articles directly superseded

the copyrighted material.  Indeed, Dow Jones provided evidence that some RWB

Email recipients relied solely on the PDF copies of the articles to read through the RWB Emails rather than purchasing "full subscription access" to the publications. (See, e.g., Dkt. # 47, Exs. R, S, T.)  Moreover, the distribution of the PDF copies of the articles for non-personal use deprived Dow Jones of its licensing fees for such use.  Accordingly, this factor weighs against fair use.

Therefore, the Court finds that Harris' use of the Dow Jones copyrighted materials is not exempt by fair use.  Accordingly, the Court **GRANTS** Dow Jones's Motion for Summary Judgment on the copyright infringement claim and **DENIES** Defendant's Motion for Summary Judgment on the same claim.

C.    Statutory Damages

A prevailing party in a copyright infringement claim is entitled to either actual damages or statutory damages.  17 U.S.C. § 504(a).  As for statutory damages, the Copyright Act provides in pertinent part: "Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.  For the purposes

of this subsection, all the parts of a compilation or derivative work constitute one work."  17 U.S.C. § 504(c)(1).

As previously ordered by the Court, Dow Jones's requests for statutory damages, if any, are limited to a per-issue basis, not a per-article basis. (Dkt. # 25 at 3) (adopting Dkt. # 21.)  Therefore, Dow Jones is required to identify the basis of its damages for its relief on its copyright infringement claims, including the exact number of affected copyrighted issues, not articles.  If Dow Jones intends to pursue statutory damages available under § 504(c)(1), it will accordingly be limited as previously ordered.

II.    Digital Millenium Copyright Act

A plaintiff must allege the following to plead a claim under § 1202(b) of the DMCA: "(1) the existence of [copyright management information ("CMI")] in connection with a copyrighted work; and (2) that a defendant 'distribute[d] . . . works [or] copies of works'; (3) while 'knowing that [CMI] has been removed or altered without authority of the copyright owner or the law'; and (4) while 'knowing, or . . . having reasonable grounds to know' that such distribution 'will induce, enable, facilitate, or conceal an infringement.'"  Mango v. BuzzFeed, Inc., 970 F.3d 167, 171 (2d Cir. 2020).

The Fifth Circuit defines CMI broadly.  Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P., 948 F.3d 261, 277 (5th Cir. 2020).

It is "any of the following information conveyed in connection with copies . . . of a work," including "[t]he title and other information identifying the work," 17 U.S.C. § 1202(c)(1); "[t]he name of, and other identifying information about," the author, copyright owner, or performer, Id. § 1202(c)(2)-(4); or "[s]uch other information as the Register of Copyrights may prescribe by regulation," id. § 1202(c)(8).

Dow Jones alleges Harris also removed or altered a variety of CMI conveyed in connection with the Dow Jones copyrighted works, including publication names, bylines, headlines, copyright notices, reproduction warnings, and file names.  (Dkt. # 1 at 11.)  However, Dow Jones does not bring a motion for summary judgment on its DMCA claims.  Harris moves for summary judgment on these claims on the basis that Dow Jones has no evidence he intentionally removed or altered Dow Jones's CMI.  (Dkt. # 46 at 14.)

Harris argues Dow Jones must prove he have had actual knowledge that CMI (1) had been removed or altered without authority, as well as (2) actual or constructive knowledge that such removal or alteration would "induce, enable, facilitate, or conceal an infringement."  Zuma Press, Inc. v. Getty Images (USA), Inc., 845 Fed. Appx. 54, 57-58 (2nd Cir. 2021) (quoting Mango, 970 F.3d at 171). Because Dow Jones has no evidence to support this requirement, Harris contends he is subject to judgment as a matter of law.  (Dkt. # 46 at 15.)

Dow Jones argues that Harris must have knowingly removed the CMI from the articles to create his emails because some of the PDF articles in certain RWB Emails do not contain some of its CMI.  (Dkt. # 46, Ex. 3 at 10.)  However, Section 1202 does not cover the mere failure to add truthful CMI to a copy.  See Huffman v. Activision Publ'g, Inc., No. 2:19-CV-00050-RWSRSP, 2020 WL 8678493, at *11 (E.D. Tex. Dec. 14, 2020), report and recommendation adopted, No. 2:19-CV-00050-RWSRSP, 2021 WL 2141352 (E.D. Tex. May 26, 2021) (granting summary judgment because Plaintiff lacked any evidence to support an essential part of his section 1202(b) claim).

Dow Jones provides no evidence that Harris ever intentionally or knowingly altered the CMI associated with the *WSJ* or *Barron's* articles. Defendant, on the other hand, provided declarations stating those involved in creating the RWB Emails never knowingly or intentionally made any deletions or alterations to any article attached to the RWB Emails.  (Dkt. # 46, Ex. 1 and Ex. 2.) Moreover, the evidence shows Harris never instructed his assistant, Sharon Toalson, or any other person to do so.  (Id. at Ex. 2-1.)  In the "Reading With Britt" Memorandum that details the process to create a RWB email, the instructions do not include methods that would remove or alter of CMI.  (Dkt. # 46, Ex. 2-1.)  In fact, the instructions direct those to print directly from websites using the print icon on the article and to directly "copy article address" and paste next to the

Publication name in the email table.  (Id.)  Further, the instructions do not mention any change in article name, any removal of CMI affiliated with each article, or withholding of publication names.

To the extent any CMI—in the form of publication names, bylines, headlines, copyright notices, reproduction warnings, and file names—was missing from the RWB Emails containing PDF copies of the articles, Harris asserts such omission was purely unintentional and must have been a result of the electronic processing needed to create an electronic attachment from an online publication. (Dkt. # 46, Ex. 1 at 3–4.)  Dow Jones offers no explanation or evidence to the contrary.

In sum, Dow Jones has not provided evidence that Harris ever knowingly removed or altered the CMI in any way and Dow Jones failed to establish a genuine dispute of material fact on scienter.  For these reasons, Dow Jones has not provided sufficient evidence to support an essential part of its Section 1202(b) claim.  See 17 U.S.C. § 1202(b) (requiring that the plaintiff prove the infringer knew "that the copyright management information has been removed or altered.").

The Court therefore **GRANTS** Harris' Motion for Summary Judgment on the DMCA claims.

22

III.    <u>Breach of Contract</u>

   In Texas, a plaintiff must establish the following essential elements of a breach of contract claim: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by defendant; and (4) damages sustained by the plaintiff as a result of the breach." <u>Smith Int'l, Inc. v. Egle Grp., LLC</u>, 490 F.3d 380, 387 (5th Cir. 2007) (quotation omitted).

   Dow Jones argues it is entitled to judgment as a matter of law on its breach of contract claim because there is no dispute of material fact that Harris agreed to and breached many provisions of the Dow Jones Subscriber Agreement and Terms of Use by distributing and providing access to Dow Jones copyrighted works to thousands of individuals on a regular basis without Dow Jones's consent. (Dkt. # 45 at 6.)

   Harris argues Dow Jones's breach of contract claim fails as a matter of law because it has no evidence that he assented to the contract it claims he breached.  (Dkt. # 46 at 17.)

  A.    <u>Existence of Valid Contract</u>

   The first issue is whether there is an enforceable agreement.  Dow Jones asserts every subscriber who receives digital access to *WSJ* and *Barron's* must agree to the Dow Jones Subscriber Agreement and Terms of Use.  (Dkt. # 45, Ex. B at 2.)  Specifically, Dow Jones argues that in exchange for subscriptions to

*WSJ* and *Barron's*, Harris agreed to pay a subscription fee and comply with the Terms of Use.  (Id. at 21.)  It is undisputed that Harris has subscribed to both *WSJ* and *Barron's* since at least 2010 and renewed his subscriptions to the digital publications in 2017 and 2018.  (Dkt. # 45, Ex. B at 2.)

In response, Harris claims he did not go online and indicate his consent to those Terms of Service; that is, he never checked an "I agree" box or otherwise indicated his consent to the Terms of Service.  (Dkt. # 46, Ex. 1 at 4.) However, the evidence at least shows that *WSJ* users were required to "check a box" to assent in creating their Dow Jones subscriptions.  (See Dkt. # 1, Ex. E at 2.) ("If you agree to be bound by the terms of this Agreement, you should check the box indicating your agreement to the terms of this Agreement on the registration page for the Service.")  Therefore, Harris agreed to the Dow Jones Subscription Agreement at the time he purchased the subscription and at the times he renewed those subscriptions.

Nevertheless, the evidence also reflects that the Subscription Agreement constitutes an enforceable agreement because Dow Jones provided a sufficient notice to users of its existence, which demonstrates their implicit assent to the agreement.  For example, in a June 29, 2018 RWB Email, there is a clear notice on the top of a *WSJ* PDF article explaining: "This copy is for your personal, non-commercial use only.  Distribution and use of this material are governed by

24

our Subscriber Agreement and by copyright law.  For non-personal use to order multiple copies, please contact Dow Jones Reprints . . .”  (Dkt. # 46 at Ex. 4-3, Ex. 4-4.)  This establishes Dow Jones provided notice to its subscribers of the Subscription Agreement and that they were bound by its terms each time an article was printed or downloaded.

Thus, Harris implicitly agreed to the following express notification at the top of each article printed from *WSJ* when he used Dow Jones's services, including the term: “This copy is for your personal, non-commercial use only.  To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.”  (Dkts. ## 45, Ex. C at 13; 47 at 25.)  The *Barron's* articles similarly contained notices on its print versions, indicating the same personal, non-commercial use only notice.  (Dkt. # 45, Ex. C at 15.)

Even if Harris claims he did not affirmatively check and “I agree” box to Dow Jones's Terms of Use, the notice on the articles provides sufficient notice that he assented to the Subscriber Agreement and its limitation on personal use. Accordingly, the Court finds Harris had actual or constructive knowledge of the website's Subscriber Agreement and he assented to be bound by the terms of the agreement each time he used the websites.  See May v. Expedia, Inc., No. A-16-CV-1211-RP, 2018 WL 4343445, at *3 (W.D. Tex. July 19, 2018), report and recommendation adopted, No. 1:16-CV-1211-RP, 2018 WL 4343427 (W.D. Tex.

Aug. 27, 2018) (finding defendant bound himself to the updated website terms when he renewed his online subscription).[2]

Therefore, there is a valid contract existing between Dow Jones and Harris by and through his actual and constructive knowledge of the Dow Jones Subscriber Agreement.

B.    Performance and Breach of Terms

The Court agrees that Dow Jones performed its obligations under the agreement by providing the services outlined in the Terms of Use to Harris.  (Dkt. # 23.)  That is also evidenced by Harris' unrestricted access to the digital publications during the duration of his subscriptions.

Therefore, the next issue for consideration is whether Harris breached the terms of the agreement.  Dow Jones alleges that Harris breached the following terms of the agreement:

> (1) By distributing Dow Jones Copyrighted Works to more than "a few individuals" and "on a regular basis" without paying the licensing fees required by the Dow Jones Reprints & Licensing Policies. (Dkt. # 1 at 18, Ex. E at § 8.2.1.)

---

[2] In Defendant's Reply (Dkt. #58 at 6, n. 5), Harris addresses that Texas law recognizes valid "clickwrap" and "sign-in wrap" agreements.  When website terms of use constitute the agreement at issue, courts look to whether the plaintiff established that "the user had actual or constructive knowledge of the terms and conditions to prove a valid contract exists between the user and the owner of the website."  DHI Grp., Inc. v. Kent, No. CV H-16-1670, 2017 WL 4837730, at *2 (S.D. Tex. Oct. 26, 2017).  For the same reasons discussed above, the Court finds Harris had at least constructive knowledge of the Subscription Agreement.

(2) By regularly providing others access to Dow Jones Copyrighted Works. (Id.; Ex. E at § 8.2.2.)

(3) By using, downloading, and storing Dow Jones Copyright Works for non-personal use. (Id.; Ex. E at § 8.2.3.)

The evidence is undisputed that Harris distributed copyrighted materials to hundreds of his former Titan students and employees at TRS and UTIMCO over the course of many years. (Dkt. # 46 at 4.)  The evidence is also undisputed that Harris never paid a licensing fee to include Dow Jones's materials in his daily RWB Emails.  (Dkt. # 45, Ex. A at 18.)  Harris had constructive knowledge that he was to contact Dow Jones Reprints to pay the appropriate licensing fee for his non-personal use in distributing the articles and did not do so.

Therefore, the Court finds that Dow Jones is entitled to judgment as a matter of law on its breach of contract claim because there is no dispute of material fact that Harris agreed to and breached the identified provisions of the Dow Jones Subscriber Agreement and Terms of Use.

Accordingly, the Court **GRANTS** Dow Jones's Motion for Summary Judgment on the breach of contract claim and **DENIES** Harris' Motion for Summary Judgment on the same claim.

IV.   Statute of Limitations Issue Preservation

In his Motion, Harris "respectfully suggests that it would be within this Court's sound discretion to stay the case or abstain from making any

dispositive rulings until the Supreme Court decides whether to take up <u>Martinelli v.</u> <u>Hearst Newspapers, LLC</u>, 65 F. 4th 231 (5th Cir. 2023).  However, the petition for writ of certiorari was denied on May 20, 2024.  <u>See</u> <u>Hearst Newspapers, L.L.C. v.</u> <u>Martinelli</u>, No. 23-474, 2024 WL 2262332 (May 20, 2024).  Therefore, this request is moot.

CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Partial Motion for Summary Judgment.  The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

**DATE:** Austin, Texas, September 17, 2024.

_____
David Alan Ezra
Senior United States District Judge